United States District Court
Southern District of Texas
**ENTERED**
January 14, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALBERT DOMINGUE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-18-1164 |
| | § | |
| ANDREW SAUL,[1] | § | |
| COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[2] are Plaintiff's Motion for Summary Judgment (Doc. 16) and Defendant's Cross-Motion for Summary Judgment (Doc. 17). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

### I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant")

---

[1]  Nancy Berryhill was the Acting Commissioner of the Social Security Administration ("SSA") at the time that Plaintiff filed this case but no longer holds that position. Andrew Saul is now Commissioner of the SSA and, as such, is automatically substituted as the defendant in this case. See 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[2]  This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 7, Ord. Dated Oct. 17, 2018.

regarding Plaintiff's claim for disability insurance benefits under Title II of the Social Security Act ("the Act").

## A. __Medical Evidence and Administrative Proceedings__

Plaintiff was born on January 8, 1979, and was thirty-six years old on the alleged disability onset date of February 1, 2015.[3] Prior to that date, Plaintiff, who attained a high school diploma and attended one year of college, worked as a driver, a route specialist, a mechanic, and a yard manager.[4] Plaintiff also was diagnosed with physical conditions, including diabetes mellitus, hypogonadism, hypertension, hypothyroidism, morbid obesity, polycythemia, and obstructive sleep apnea.[5]

Beginning in February 2015, Plaintiff regularly received treatment for the diagnoses bipolar disorder, post traumatic stress disorder ("PTSD"), and depression.[6] Athi Venkatesh, M.D., ("Dr. Venkatesh") initially saw Plaintiff on February 16, 2015, for medication management.[7] Via a mental status examination, Dr. Venkatesh found Plaintiff to be very restless and agitated but fully alert and oriented with normal attention, concentration,

---

[3]    See Doc. 6, Tr. of the Admin. Proceedings ("Tr.") 47, 56, 57, 72, 231.

[4]    See Tr. 282, 291-98, 343-50.

[5]    See, e.g., Tr. 469-72.

[6]    See Tr. 444-53, 524-41, 570-77, 583-642, 645, 651-722, 726-802, 813-23, 826, 829-30, 834-50, 856-67.

[7]    See Tr. 524-26.

memory, speech, and language.[8]  Dr. Venkatesh also recorded that Plaintiff's thought process was logical and coherent with no abnormal content and that his judgment and insight were fair.[9] Plaintiff denied audio or visual hallucinations, paranoia, or suicidal or homicidal ideation.[10]

Throughout the relevant period, Plaintiff was seen on an outpatient basis approximately monthly by a psychiatrist or nurse practitioner for medication management.[11]  Overall, treatment notes reflected that medication minimized Plaintiff's psychiatric symptoms.[12]  Mental status examinations on Plaintiff routinely returned results within the normal range although, at times, Plaintiff exhibited impaired memory, concentration, and/or judgment.[13]  Plaintiff also regularly attended individual and family therapy sessions.[14]

In June 2015, Plaintiff attended a partial hospitalization program ("PHP"), which was a daily, intensive outpatient program involving therapy modalities and biweekly appointments for

---

[8]    See Tr. 525.

[9]    See id.

[10]   See id.

[11]   See Tr. 524-41, 570-77, 645, 813-23, 834-50, 856-67.

[12]   See, e.g., Tr. 528, 531, 533, 535, 572, 574, 813, 816, 834, 837, 840, 849, 856.

[13]   See, e.g., Tr. 527, 528, 530, 532, 539-40, 814, 817, 835, 838, 841, 844, 850, 857, 866.

[14]   See Tr. 826, 829-30.

medication management.[15]  His psychiatric diagnoses upon discharge were bipolar type II disorder and PTSD (resolving).[16]

On June 22, 2015, Plaintiff applied for disability insurance benefits claiming an inability to work since February 1, 2015, due to bipolar disorder and PTSD.[17]  In a function report dated October 12, 2015, Plaintiff described his usual daily routine as relaxing, trying to motivate himself to perform chores around the house, watching television, and engaging in social media.[18]  He also reported that he walked the dog, managed his own personal care, prepared his own meals, washed laundry and dishes, shopped for groceries, attended church, and was able to pay attention for twenty minutes at a time and follow written and verbal instructions well.[19]

On October 19, 2015, the SSA found Plaintiff not disabled at the initial level of review.[20]  A consulting psychiatrist reviewed Plaintiff's record and determined Plaintiff to be no more than moderately limited in any of the four broad areas of mental functioning and concluded that Plaintiff could "understand, remember, and carry out detailed but not complex instructions, make

---

[15]    See Tr. 444-53, 583-642, 889.

[16]    See Tr. 444.

[17]    See Tr. 47, 56, 57, 72, 231-32.

[18]    Tr. 323.

[19]    See Tr. 323-27.

[20]    See Tr. 47-56, 111-15.

decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in [a] routine work setting."[21]

On December 15, 2015, Plaintiff reported the same daily routine and activities of daily living ("ADLs") as he had described in October 2015.[22]  His function report reflected no significant changes in his abilities with the exception of following written and verbal instructions, which he downgraded from being able to follow instructions well to requiring repetition and verbal assistance.[23]

On February 10, 2016, Plaintiff attended a consultative psychological examination with Merrill Anderson, Ph.D., ("Dr. Anderson").[24]  Plaintiff reported mild depression, long-term anger issues, and decreased motivation and interests.[25]  Plaintiff denied recent suicidal ideation but reported an August 2015 suicidal gesture.[26]  Plaintiff also denied hallucinations and delusions.[27]

---

[21]    Tr. 54; see also Tr. 52-53.

[22]    Compare Tr. 323-26 with Tr. 353-56.

[23]    Compare Tr. 327 with Tr. 357.

[24]    See Tr. 564-66.

[25]    See Tr. 565.

[26]    See id.

[27]    See id.

Plaintiff identified his experiences as a correctional officer at age nineteen as the trauma that precipitated PTSD.[28]  He denied experiencing any flashback in the prior ten years.[29]  Plaintiff told Dr. Anderson that he had experienced panic episodes with the most recent occurring more than a year earlier and that he feared crowd situations.[30]  Plaintiff reported his ADLs as including dishwashing, preparing simple meals, cleaning dirty laundry, assisting with groceries, sweeping, mopping, vacuuming, running errands, driving himself to appointments, assisting with his wife's craft business, watching television, and engaging in social media.[31]

Dr. Anderson discerned that Plaintiff's mental activity "was of coherent form, normal content, and mildly slowed pace."[32]  Dr. Anderson found Plaintiff's remote memory to be intact, his recent memory to be excellent, and his immediate memory for digits to be average.[33]  According to Dr. Anderson, Plaintiff's concentration/attention, abstraction, insight/judgment, persistence, were all within normal ranges.[34]  Dr. Anderson described Plaintiff's RFC:

> Claimant is able to understand, carry out, and

---

[28]   See Tr. 565, 884.

[29]   See Tr. 565.

[30]   See id.

[31]   See id.

[32]   Id.

[33]   See id.

[34]   See Tr. 565–66.

remember instructions for moderately complex procedures. Ability to sustain concentration and to persist in work-related activity at a reasonable pace is fair. Ability to maintain effective social interaction with supervisors, co-workers, and the public is moderately impaired. Ability to handle normal pressures of a competitive work setting is markedly impaired.[35]

On February 25, 2016, the SSA notified Plaintiff that it had disapproved his claim upon reconsideration.[36] At that time a medical doctor and a psychologist reviewed Plaintiff's record.[37] The consulting psychologist, Norvin Curtis, Ph.D., ("Dr. Curtis"), found Plaintiff slightly more limited than the prior reviewer in the "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" but concurred on Plaintiff's remaining ability to perform work-related mental activities.[38]

On March 15, 2016, Plaintiff was readmitted to the PHP, then was transitioned to a less intensive outpatient program on April 1, 2016, and was discharged on April 22, 2016.[39] Plaintiff's discharge diagnoses were major depression and bipolar II disorder.[40]

---

[35]   Tr. 566.

[36]   See Tr. 57-72, 117-20.

[37]   See Tr. 62-68.

[38]   Compare Tr. 52-54 with Tr. 66-68.

[39]   See Tr. 651-722, 726-802.

[40]   See Tr. 654.

On May 12, 2016, Dr. Venkatesh completed a medical source statement in which he opined that Plaintiff experienced marked limitations in twenty areas of mental abilities and aptitude to perform work.[41]   As explanation, Dr. Venkatesh stated: (1) that Plaintiff's "anger[] and irritability [was] easily triggered by simple situations[;]" (2) that his "medications [were] being adjusted to manage anger, mood l[]ability[,] and racing thoughts which impair his attention and focus[;]" (3) that his recall and memory were impaired due to depression, mood lability, and anxiety; and (4) that his "anger and mood lability [were] marked in new situations and crowd[s], unfamiliar people trigger anxiety which leads and escalates to anger."[42]   Dr. Venkatesh also stated that managing appointments and completing paperwork caused Plaintiff "a lot of stress and anxiety."[43]   In Dr. Venkatesh's opinion, Plaintiff would miss more than four days of work per month.[44]

Plaintiff requested a hearing before an ALJ, and the hearing was held on August 8, 2016.[45]   At the hearing, Plaintiff and a vocational expert testified.[46]   Plaintiff was represented by an

---

[41]    See Tr. 645-47.

[42]    Tr. 646-47.

[43]    Tr. 647.

[44]    See id.

[45]    See Tr. 121-22, 127, Suppl. Tr. 868-905.

[46]    Doc. 15-1,  Suppl. Tr. of the Admin. Proceedings ("Suppl. Tr.") 868, 871-904.

attorney.[47]  Plaintiff opined that the recent positive reports from Kingwood Psychiatry, which accurately reflected that he was doing fairly well, he was able to handle stressors, and his medications were helping, reflected success based entirely on his remaining at home most of the day.[48]

The ALJ asked if Plaintiff thought "that picture might change" if he reentered the "working world," to which Plaintiff answered:

> Yes, sir. . . . Obviously, there's the anxiety and just the feeling of -- paranoia, the chest pains, the sweating, the constant looking over my shoulder to see what's going to happen next -- you know, somebody out to get me kind of thing, and just making sure that that's not having [sic], making sure that I have all my ducks in a row -- you know, just being able to make sure that I can function.[49]

When asked what happened in early 2015 that caused Plaintiff to stop working as a local-route truck driver, Plaintiff said, "The week that all this started, I had three panic attacks three different days, three days in a row on the way to that current job."[50]  Plaintiff described the attacks as occurring at approximately three in the morning and causing chest tightness, perspiration, and difficulty with breathing.[51]  He also reported

---

[47]    See Suppl. Tr. 868.

[48]    See Tr. 883.

[49]    Tr. 884.

[50]    Tr. 877-78.

[51]    See Tr. 878.

that "there was a period that [he] couldn't concentrate on the road because [he] thought that there was something bad going to happen."[52]  He said that, each time, he spent about twenty minutes in a parking lot until speaking with his wife by phone calmed him.[53]

Prior to the three panic attacks around the alleged onset date, Plaintiff testified, he had experienced "some" panic attacks previously, mentioning that he had experienced several while working a different position as a driver, which precipitated a six-month inability to work while undergoing medication adjustments.[54]

The ALJ pressed Plaintiff to explained what it was about his driving jobs, which involved very little contact with others, that triggered panic attacks.[55]  Plaintiff responded:

> One, I believe the early morning hours, not getting enough rest; number two, the deadlines, the appointments that I had to meet -- the way the company scheduled it, there was very little time in between.  Traffic played a big deal in it, in early morning rush hour traffic, trying to make sure that I get to where I need to be. . . . And then whenever you get there, making sure that everything's there.  And then you only have a limited time to unload so you're always . . . pushing up against a deadline . . . .[56]

Plaintiff said that no full-time job (even without those stressors) would avoid "an implication of not being able to do a good job[,]"

---

[52]     Id.

[53]     See id.

[54]     See Tr. 885.

[55]     See Tr. 885-86.

[56]     Tr. 886-87.

10

and, accordingly, Plaintiff opined, he could perform no full-time job.[57]

Upon questioning by his attorney, Plaintiff explained that, immediately after completing the PHP in 2015, he was able to drive to appointments, make the bed, cook dinner twice a week, go to the corner store or local grocery store, volunteer at his church.[58] However, he said that, when he overextended himself by volunteering four or five times a week, he stopped paying attention to his stressors and, ultimately, reentered the PHP in 2016.[59] Plaintiff confirmed that he had never received inpatient treatment.[60] After completion of the second PHP, Plaintiff continued individual therapy once per week and family therapy once per week.[61]

As of the date of the hearing, Plaintiff reported, he had not had a panic attack for six months.[62] He said he was able to cook a family meal once or twice a week, to take care of his personal hygiene, to make the bed, to go to the grocery store, to attend church, to attend therapy appointments, but was not able to clean the house.[63]

--------

[57]   Tr. 887.

[58]   <u>See</u> Tr. 889-90.

[59]   <u>See</u> Tr. 890-91.

[60]   <u>See</u> Tr. 893.

[61]   <u>See</u> Tr. 894-95.

[62]   <u>See</u> Tr. 895.

[63]   <u>See</u> Tr. 896-98.

The ALJ posed the following hypothetical individual to the vocational expert:

> Assume a hypothetical claimant of the same age, education, background, and work experience. Further assume that the hypothetical claimant has no exertional limitations but does have the following non-exertional limitations:
>
> That person can understand, remember, and carry out detailed but not complex instructions and tasks. That person must work in a low-stress job. That is one not requiring forced pace or assembly line production or deadlines. The person can only occasionally interact . . . with coworkers [and] the public, and that person may be off task up to 10 percent of the day due to psychological stressors.[64]

The vocational expert opined that such an individual could not perform Plaintiff's prior work but could perform the unskilled jobs of janitor, linen clerk, and non-postal mail clerk.[65] Plaintiff's attorney posed several additional limitations, including whether sixty-eight absences in eighteen months would preclude full-time competitive work.[66] The vocational expert confirmed that an individual who missed that many work days would be unemployable.[67]

The ALJ issued an unfavorable decision on August 30, 2016.[68] On September 30, 2016, Plaintiff filed a request for review of the ALJ's decision.[69] On November 30, 2016, the Appeals Council granted

---

[64] Tr. 899-900.

[65] See Tr. 900.

[66] See Tr. 902-04.

[67] See Tr. 904.

[68] See Tr. 73-85.

[69] See Tr. 156.

Plaintiff's request and, upon review, found that the ALJ's decision inadequately evaluated Dr. Anderson's report:

> Dr. Anderson concluded, in pertinent part, that the claimant's ability to handle normal pressures of a competitive work setting is markedly impaired. The hearing decision states that Dr. Anderson's conclusions were given significant weight. However, the decision does not sufficiently address this portion of Dr. Anderson's opinion or include correlating limitations in determining the claimant's [RFC]. Therefore, further evaluation is necessary.[70]

The Appeals Council directed the ALJ to reconsider Dr. Anderson's opinion under the SSA rules and explain the weight accorded that opinion, to further consider Plaintiff's RFC and provide rationale with cites to the record evidence, and, if warranted, to obtain supplemental testimony from a vocational expert.[71] The order also directed the ALJ to offer Plaintiff a new hearing.[72]

The ALJ scheduled a second hearing on July 7, 2017.[73] At the hearing, the ALJ explained the status of the case on remand:

> [M]y position today is that we really don't need any new testimony of any sort. This is really -- I hate to say a legal issue, but it's a factual legal issue mix, but it's basically for consideration by the Court of how to handle Dr. Anderson's opinions, which are already on record.[74]

---

[70]   Tr. 93.

[71]   <u>See</u> Tr. 93-94.

[72]   <u>See</u> Tr. 94.

[73]   <u>See</u> Tr. 175.

[74]   Tr. 44.

The ALJ offered Plaintiff's attorney the opportunity to present additional information or to question the vocational expert, but the attorney agreed, "I don't see that we could add anything new."[75]

## B.  **ALJ's Second Decision**[76]

On October 25, 2017, the ALJ issued a second unfavorable decision.[77]  The ALJ found that Plaintiff had not engaged in substantial gainful activity since February 1, 2015, the alleged onset date.[78]  The ALJ recognized Plaintiff's affective disorder and anxiety as severe.[79]  However, he found "diabetes mellitus, hypothyroidism, morbid obesity, hypogonadism, polyscythemia, and hypercholesterolemia" to be nonsevere impairments.[80]  At the next step, the ALJ found that Plaintiff did not meet the requirements of any impairment identified in the regulations as presumptively disabling[81] (the "Listings"),[82] addressing Listings 12.04 (depressive, bipolar, and related disorders) and 12.06 (anxiety and

---

[75]     Tr. 45; see also Tr. 44.

[76]     With the obvious exception of the ALJ's consideration of Dr. Anderson's opinion, much of the ALJ's second decision draws content from the ALJ's first decision.  Compare Tr. 76-85 with Tr. 15-25.

[77]     See Tr. 12-25.

[78]     See Tr. 18.

[79]     See id.

[80]     See id.

[81]     See 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[82]     See Tr. 22-24.

obsessive-compulsive disorders).[83]

The ALJ found Plaintiff capable of performing:

a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can understand, remember, and carry out detailed but not complex instructions and tasks.  The claimant must be in a low stress job, not requiring forced pace, assembly line production or deadlines.  The claimant can have occasional interaction with coworkers and public.  The claimant may[ ]be off task up to ten percent of the day due to psychological stressors.[84]

In support of this assessment, the ALJ addressed Plaintiff's subjective testimony and the objective medical evidence on his psychiatric condition, including the mention of Plaintiff's intensive outpatient treatment.[85]  The ALJ also discussed the medical opinions of Dr. Anderson, Dr. Venkatesh, and Dr. Curtis, explaining the weight the ALJ accorded each one.[86]

The ALJ made particular note of evidence that Plaintiff's symptoms were controlled with medications, that he had not experienced a panic attack in the prior six months, and that he was able to perform household chores and errands, to engage in social media, to attend church, and to manage his own hygiene.[87]  The ALJ found Plaintiff's allegations of disabling pain and limitation not

---

[83]     See Tr. 18-19.

[84]     Tr. 19 (emphasis omitted).

[85]     See Tr. 20-21.

[86]     See Tr. 21-23.

[87]     See Tr. 20.

corroborated in the overall record and therefore gave his testimony little weight.[88]

The ALJ re-evaluated the weight to be accorded Dr. Anderson's opinion upon reconsideration, stating:

> By way of further analysis of Dr. Anderson's opinion, the undersigned determined that the quoted opinion was entitled to only little weight because it was not supported by the other information in the medical evidence of record; it was further not supported by and in fact flatly contradicted by the specific notations of Dr. Anderson elsewhere in his report of his specific findings on examination of the claimant. Dr. Anderson noted that the claimant alleged panic attacks that interfered with his ability to work; however, his most recent panic attack at the time of the examination was January 2015, more than a year prior to the examination. Furthermore, Dr. Anderson noted the claimant maintained intact cognitive functioning, including adequate judgment for structured, routine tasks and situations. As discussed above, the claimant exhibited intact concentration, adequate persistence, and only mildly slowed pace, findings not indicative of marked limitation. Beyond Dr. Anderson's own findings, the remainder of the claimant's record indicated good response to medication and no evidence of a frequency of sufficiently severe panic episodes to support marked limitation in handling normal pressures of competitive work. Therefore, the finding of a "marked" impairment regarding handling the pressures of the workplace was discounted by the undersigned. Further, the undersigned's [RFC] remains unchanged, as the limitations stated in that RFC already adequately provide for a "moderate or less" impairment of the ability to handle normal work pressures.[89]

The ALJ also specifically recounted the information in the medical source statement completed by Dr. Venkatesh and gave it "little weight, as it was not supported by the mental status

---

[88]   See Tr. 23.

[89]   Tr. 22 (internal citations omitted).

examinations" and the findings of the consultative examination regarding Plaintiff's concentration, persistence, pace, mentation, orientation, and memory.[90]  The ALJ noted that treating source opinions on issues reserved to the Commissioner were not entitled to controlling weight.[91]

Regarding Dr. Curtis's documentation about Plaintiff's mental ability to perform work-related activities, the ALJ stated, "Although Dr. Curtis was non-examining personnel, the opinion deserved some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions, as explained throughout this decision."[92]

Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff was unable to perform his past relevant work.[93]  However, considering Plaintiff's age as a younger individual, his education, his work experience, and his RFC, the ALJ found Plaintiff was able to perform the occupations of janitor, linen clerk, and mail clerk.[94]  Accordingly, the ALJ found that Plaintiff was not disabled at any time from the alleged onset date to the date of the ALJ's decision.[95]

---

[90]   Id.

[91]   See Tr. 23.

[92]   Tr. 22-23.

[93]   See id.

[94]   See Tr. 24.

[95]   See Tr. 16, 25.

17

On December 13, 2017, Plaintiff appealed the ALJ's second unfavorable decision.[96]  On February 1, 2018, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[97]  After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).  Under the applicable legal standard, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The

---

[96]   See Tr. 226.

[97]   See Tr. 1-5.

existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

<u>Bowling v. Shalala</u>, 36 F.3d 431, 435 (5th Cir. 1994); <u>see also</u> 20 C.F.R. § 404.1520. The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. <u>Greenspan</u>, 38 F.3d at 236.

## B.   <u>Substantial Evidence</u>

Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Biestek v. Berryhill</u>, ____ U.S. ____, 139 S. Ct. 1148, 1154 (2019)(internal quotations marks omitted). "[W]hatever

the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." Id.  It only requires "more than a mere scintilla." Id.

The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. See Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ's decision contains the following errors:

1. Defendant's Decision Is Not Supported By Substantial Evidence.

2.    Defendant   Failed   to   Follow   The   Opinion   of
[Plaintiff's] Treating Physician.

3.    Defendant's Hypothetical To The Vocational Expert
Failed    to    Include    All    of    [Plaintiff's]
Limitations.[98]

Defendant argues that the ALJ's decision is legally sound and is
supported by substantial evidence.

## A.    **Substantial Evidence**[99]

As   explained   above,   the   court's   duty   with   regard   to
substantial  evidence  is  confined  to  assessing  whether  adequate
relevant  evidence  reasonably  supports  the  ALJ's  conclusion.   See
Biestek,  139  S.  Ct.  at  1154.   That  threshold  is  so  low  that  the
decision  is  to  be  upheld  even  if  contrary  evidence  preponderates.
See Copeland v. Colvin, 771 F.3d 920, 923 (5th Cir. 2014)(defining
substantial  evidence  as  "more  than  a  mere  scintilla  and  less  than
a preponderance")(quoting Perez v. Barnhart, 415 F.3d 457, 461 (5th
Cir.  2005));  see also  42  U.S.C.  §  405(g)(stating  that  a  decision
supported  by  substantial  evidence  should  not  be  disturbed).   As  a
corollary,  a  decision  that  is  supported  by  substantial  (a  mere
scintilla  of)  evidence  need  not  address  everything  in  the  record.
See   Giles   v.   Astrue,   433   F.   App'x   241,   251   (5th   Cir.

---

[98]    Doc. 16, Pl.'s Mot. for Summ. J. p. 2.

[99]    In his motion, Plaintiff "assert[ed] that Defendant committed error
at  Step  Three  by  failing  to  consider  all  of  the  evidence  which  supports
[Plaintiff's]  disabling  psychiatric  symptoms."   Id.  pp.  9-10.   However,
Plaintiff's  discussion  of  this  alleged  error  does  not  mention  any  Listing  and
appears to address the step four assessment of Plaintiff's RFC.  See id. pp. 10-
21.

2011)(unpublished)("[T]here will always be some evidence that is not specifically discussed in the Commissioner's decision.   Our review is limited to examining whether the decision to deny benefits is supported by substantial evidence in the record[.]").

Plaintiff specifically argues that the evidence "tells a different story" from the ALJ's determination that Plaintiff could perform full-time competitive work after February 1, 2015.[100] Plaintiff further complains that the ALJ "failed to acknowledge the severe, chronic and debilitating nature of the disease."[101]  These disagreements with the ALJ's evaluation and outcome, as well as the record evidence Plaintiff cites in favor of disability, are irrelevant if substantial evidence supports the conclusion that Plaintiff could perform other work existing in the economy.

Plaintiff also challenges the ALJ's decision for failure to address Plaintiff's "multiple psychiatric hospitalizations."  In addition to being an overstatement, this is incorrect.  Plaintiff was admitted to outpatient programs twice during the relevant period, in June 2015 and March 2016.  These voluntary programs consumed multiple hours per day but were not inpatient hospitalizations, which would have required a greater degree of decompensation and/or dysfunction.   Plaintiff was never hospitalized as an inpatient.

---

[100]   Doc. 16, Pl.'s Mot. for Summ. J. p. 11; see also id. p. 10.

[101]   See id. p. 20.

Plaintiff's assertion that the ALJ did not address the two partial hospitalizations is also incorrect.  The ALJ specifically addressed the first PHP by noting the dates of participation and acknowledging Plaintiff's coterminous score on the global assessment of functioning scale.  The second PHP was mentioned in the ALJ's account of Plaintiff's hearing testimony.  Although the ALJ did not provide the dates of or discuss the treatment during the second program, he was not required to do so.  See Giles, 433 F. App'x at 251.  His mentioning it at all confirms that he considered it in his deliberations.

As a final point, the court is not moved by Plaintiff's suggestion that the ALJ should have found Plaintiff unemployable because he would not have been able to work while he was attending the PHPs, which totaled fifty-six days over eleven months.  First of all, Plaintiff was not employed at the time and voluntarily entered the intensive treatment.  No evidence supports the speculation that, under different employment circumstances, Plaintiff would have participated in the PHPs or that the admission into the PHPs was based on Plaintiff's inability to perform work-related activities.  Ironically, his participation in a program that required his attendance for multiple hours everyday, his interaction with others, and his attention and concentration throughout each day reflects, instead, that he was capable of performing a circumscribed set of work-related activities.

23

The ALJ cited, among other evidence, Plaintiff's ADLs, prolonged absence of panic attacks, and treatment success in support of his ability to perform other work.  As this evidence amounted to more than a mere scintilla, it is substantial evidence. The ALJ fulfilled his responsibilities on this front.

**B.   Dr. Venkatesh's Opinion**[102]

The ALJ must evaluate every medical opinion in the record and decide what weight to give each.  See 20 C.F.R. § 404.1527(c). Generally, the ALJ will give more weight to medical sources who treated the claimant because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations."  20 C.F.R. § 404.1527(c)(2); see also Greenspan, 38 F.3d at 237 (quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); SSR 96-5p, 1996 WL 374183, at *2.

The ALJ is required to give good reasons for the weight given a treating source's opinion.  20 C.F.R. § 404.1527(c)(2);  SSR 96-2p, 1996 WL 374188, at *5.

When the determination or decision . . . is a denial[,] . . . the notice of the determination or decision must

---

[102]    In his motion, Plaintiff stated, "Additional error occurred at Step Three; the ALJ failed to follow the opinion of [Plaintiff's] Treating Physician." Doc. 16, Pl.'s Mot. for Summ. J. p. 10.  However, Plaintiff's discussion of this alleged error does not mention any Listing and appears to address the step four assessment of Plaintiff's RFC.  See id. pp. 21-27.

> contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5. The regulations require that, when a treating source's opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record, it is to be given controlling weight. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *1.

When the ALJ does not give a treating physician's opinion controlling weight, he must apply the following nonexclusive factors to determine the weight to give the opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment relationship;" (3) the relevant medical evidence supporting the opinion; (4) the consistency of the opinion with the remainder of the medical record; and (5) the treating physician's area of specialization. 20 C.F.R. § 404.1527(c)(2). However, the ALJ is only required to consider these factors in deciding what weight to give a medical source opinion; he is not required to record in writing every step of the process. 20 C.F.R. § 404.1527(c) ("Unless we give a treating source's opinion controlling weight . . . we *consider* all of the following factors in deciding the weight we

give to any medical opinion.")(emphasis added).

Plaintiff argues that the ALJ's granting little weight to Dr. Venkatesh's opinion was contrary to Dr. Anderson's opinion that Plaintiff's "[a]bility to handle normal pressures of a competitive work setting [wa]s markedly impaired" and "contrary to <u>many</u> psychiatric entries."[103]

Simply put, the opinions expressed in Dr. Venkatesh's medical source statement are not entitled to controlling weight.  First and foremost, it is debatable whether Dr. Venkatesh qualified as a treating physician.  The only outpatient treatment note signed by Dr. Venkatesh as Plaintiff's provider was the initial evaluation in February 2015.  At all other appointments, another provider in the same practice group treated Plaintiff.[104]  Interestingly, at the first hearing, Plaintiff identified Nurse Practitioner Jo-Ann Negron as his psychiatrist.[105]  If nothing else, the lack of contact with Plaintiff was a factor justifying the ALJ's decision to give Dr. Venkatesh's medical source statement, completed more than a year after the initial evaluation, less than controlling weight.

Beyond that, the ALJ provided good reasons for discounting the weight he allowed Dr. Venkatesh's opinions on Plaintiff's ability

---

[103]     <u>Id.</u> p. 24 (quoting Tr. 566).

[104]     The record contained at least one treatment note that Dr. Venkatesh signed as a reviewer, perhaps in a supervisory capacity as there was no indication that Dr. Venkatesh had attended that appointment with Plaintiff.

[105]     <u>See</u> Tr. 885.

to perform work-related activities.  The ALJ noted that the degree of Plaintiff's limitations as opined by Dr. Venkatesh was not consistent as a whole with the mental status examinations performed at the regularly scheduled appointments or with the results of Dr. Anderson's consultative examination.

As the ALJ evaluated Dr. Venkatesh's opinion and provided good reasons for discounting it, the ALJ did not err by affording little weight to Dr. Venkatesh's medical source statement.

## C.  **Hypothetical Individual**

Absent an unresolved conflict between the Dictionary of Occupational Titles and the vocational expert's testimony, the ALJ may rely on the vocational expert's testimony as substantial evidence of an individual's ability to perform certain jobs as long as the ALJ posed a hypothetical question that incorporated all of the impairments that the ALJ recognized as supported by the record and the claimant was given an opportunity to correct errors or omissions in the hypothetical question.  See SSR 00-4p, 2000 WL 1898704, at *4; Wise v. Barnhart, 101 F. App'x 950, 951 (5th Cir. 2004)(unpublished)(citing Bowling, 36 F.3d at 436).

Plaintiff contends that the ALJ failed to include numerous absences due to the PHP admissions and due to Plaintiff's attendance at two therapy appointments per month.  In addition to the above discussion about the PHPs, nothing in the record indicated that Plaintiff had since or would in the future return to

intensive therapy programs.  Additionally, Plaintiff failed to explain why he would be unable to attend biweekly therapy appointments outside of work hours.

The ALJ did precisely what the law requires.  He presented a hypothetical question to the vocational expert that included all of the limitations the ALJ acknowledged as supported by the record. Based on that hypothetical question and a review of the medical record and hearing testimony, the vocational expert offered three examples of jobs that Plaintiff could perform.  The vocational expert's testimony is substantial evidence supporting the ALJ's decision.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers

of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 14th day of January, 2020.

_____
Nancy K. Johnson
United States Magistrate Judge